### In re MANNING.

#### CALHOUN v. BANK OF CLIO.

(District Court, D. South Carolina. May 12, 1903.)

1. BANKRUPTCY—VOIDABLE PREFERENCE—EXCHANGE OF SECURITIES.

A mortgage given by an insolvent within 4 months prior to his bankruptcy, to secure an existing indebtedness in lieu of other security which

¶ 1. See Bankruptcy, vol. 6, Cent. Dig. § 266.

is surrendered, constitutes a preference, unless the security surrendered was of equal value; and where such security was of less value the mortgage is voidable by the trustee as to the excess, if it appears that the creditor knew or had reasonable cause to believe that the debtor was insolvent, and intended thereby to obtain a preference.

In Bankruptcy. On petition of trustee to set aside a mortgage as a preference.

T. W. Bouchier and C. P. Townsend, for the Bank.

H. H. Newton and Mitchell & Smith, for creditors.

T. I. Rogers, for bankrupt.

BRAWLEY, District Judge. This case comes up upon a petition of Calhoun, trustee, praying that a mortgage given to the Bank of Clio within four months of the adjudication in bankruptcy be declared void, and the return and answer of the Bank of Clio, and the testimony.

The facts as disclosed by the pleadings and testimony appear to be as follows: John Manning was a preacher, retired for age, and engaged during the last few years in a mercantile business in the town of Clio, advancing on agricultural liens to farmers in the county of Marlborough, and owning several tracts of land in that county, and appears to have been in January, 1901, in good financial condition, although his mercantile business does not seem to have been profitable. On January 10, 1901, he obtained from the Bank of Clio $6,000, giving three notes of that date, one for $2,120, payable October 7, 1901; one for $2,123.33, payable November 7, 1901; and one for $2,146.67, payable December 7, 1901. To secure the payment of these notes, he assigned and delivered to the Bank of Clio a large number of accounts, agricultural liens, and bills of sale, the money having been borrowed from the bank to enable him to purchase fertilizers and other articles to be advanced to his customers on liens, etc. On May 1, 1901, he obtained a further loan of $1,500 for the same purpose, giving his note payable December 7, 1901, and assigning and delivering additional notes, rent contracts, and liens. The face value of the notes, bills of sale, rent contracts, and liens assigned as security amounted to about $19,250. The year 1901, owing to the bad seasons, proved to be an unfortunate one for all persons engaged in agricultural operations in that section. Collections were slow and difficult. In October, Manning was pressed by one of his creditors, McNair and Pearsall, whose agent endeavored to obtain payment or security for the debt, and November 11th, being then indebted to the Bank of Clio in the sum of $7,200, said Bank having previously collected about $680 on the collaterals held by it, Manning arranged with the bank for a further loan of $900 in cash, and for the additional sum of $1,000, the value of cotton collected by him on liens held by the bank, the whole aggregating $8,100, and to secure the same gave his notes for that amount, and a mortgage upon the four tracts of land described in the pleadings, and the bank delivered up to him all of the liens, bills of sale, notes, and other collateral held by it. It is this mortgage which is attacked,

the allegation of the petition being that these collaterals had become worthless; that Manning was at that time insolvent, and on the verge of bankruptcy; and that the Bank of Clio knew that Manning was insolvent, and took the mortgage, thereby obtaining a valid security in substitution for collaterals that had turned out to be worthless.

The solution of the question presented is not easy. The chief difficulty lies in the fact that it is impossible at this late date to determine with any approximation to accuracy the true value of the securities surrendered at the time the mortgage was given. Only a small part of their face value was realized, and the expectation then indulged, that Manning would be able by the aid of the new loan to "pull through," was disappointed; for on January 10th Manning made an assignment for the benefit of his creditors, and the proceedings in bankruptcy shortly thereafter supervened. The petition in involuntary bankruptcy was filed January 21st, and adjudication followed February 14, 1902. The Bank of Clio contends that the failure to collect a larger amount upon the collaterals surrendered to Manning was largely due to the carelessness and inattention and lack of zeal on the part of Manning and of his assignee. It is impossible to determine with anything like absolute certainty the correctness of this contention. The collaterals turned over to Manning were in the main liens upon the crops of small farmers, the value of which depended entirely upon the crops, for the debtors were in the main persons of no substance. All accounts agree that the year 1901 was the most disastrous ever known in that region, and I am forced to the conclusion that the securities surrendered to Manning were of doubtful value. At the date when the mortgage was executed, November 11th, it must have been well known to all of the parties to the transaction that the collection of these claims was doubtful, if not impossible; for at that time the cotton crop had probably so far matured as to make it comparatively easy of ascertainment that there would not be sufficient cotton in the possession of the debtors to enable them to pay their liens and other advancements, and the collection of amounts due from the small crops of grain and other produce would necessarily entail great difficulty and expense. If Manning had been younger and more alert, he possibly might have collected more than was actually collected; but the officers of the Bank of Clio must have known, or have had reasonable cause to know, that he was not such a man, and at the time they took the mortgage and surrendered the collaterals they must have known that they were surrendering securities of doubtful value, and the security taken in lieu thereof must have been considered by them of higher value than that which was surrendered.

Conceding all that is claimed by them—that the Bank of Clio, as stated in its return to the petition herein, "was not fully acquainted with his financial condition, and did not have any knowledge that John Manning was, at that time, insolvent," and that they made the additional loan in good faith, believing that with such assistance Manning would be able to "pull through"—the fact remains that he did not pull through; that within less than two months he was forced to abandon all hope of doing so; and that in fact he had proved to

be insolvent and was adjudicated a bankrupt within less than three months after the execution of the mortgage. I must reach the conclusion that, in the circumstances, there was sufficient ground for an ordinarily prudent business man to know that Manning was in a condition approaching insolvency, and that the bank desired to save itself from the consequences of insolvency by exchanging securities of doubtful value for a security of real value.

There is nothing in the bankrupt law which forbids an exchange of securities, and if a person, even while insolvent, makes such exchange as will not diminish the value of his estate, it is unimpeachable; but the court is bound, when such a transaction is reviewed, to satisfy itself that the securities exchanged are of undoubtedly equal value. When a person is adjudged a bankrupt his property is sequestrated by law for equal distribution among his creditors, and all transactions, payments, or transfers of property within four months prior thereto are reviewable; and if it should appear that, as the result of any such transactions, one creditor has obtained, or is likely to obtain, a greater percentage of the estate than other creditors of the same class, such preference must be surrendered so that equality may be preserved. In so far as the mortgage secures the additional loan of $900 in cash, advanced at the date of its execution, and the $1,000, the value of the cotton then in possession of the bankrupt, belonging to the bank, it should be sustained as being for a present consideration, and I am of opinion that it should be sustained to the extent of the value of the collateral surrendered. For reasons already stated, it is impossible to determine accurately this amount. Counsel for the bank has presented a "statement of amounts collected by Manning, his assignee and trustee, out of Bank of Clio collaterals after the 12th day of November, A. D. 1901, showing such amount to be $2,108.10." Of this amount the bank was entitled to 76 per cent., the other 24 per cent. being due to the Virginia-Carolina Chemical Company. The correctness of some of the items of this account is questioned by counsel for creditors. I will not attempt to pass upon the correctness of these items, and will take this statement of the Bank of Clio as representing correctly the amount which actually was, or might reasonably have been, collected. Seventy-six per cent. of this amount is $1,602.15, and the mortgage will be sustained as valid to the extent of this amount, and will be set aside as a preference as to the balance remaining due. Appropriate orders will be entered in conformity with this opinion, providing that upon the foreclosure of the mortgage the Bank of Clio shall receive out of the proceeds the sum of $3,502.15, and that as to the remainder of its debt it shall share pro rata with creditors in the balance, which will be turned over to the trustee for distribution among all the creditors of the bankrupt.

(May 13, 1903.)

In the opinion of the court filed herein, May 12, 1903, the value of the cotton belonging to the Bank of Clio, and which it allowed Manning to retain, was placed as of the value of $1,000. This amount should have been $600, and the said opinion is hereby amended to

that extent, so that the mortgage is sustained as to the additional loan in cash of $900, and the value of the cotton $600, and the value of the collaterals exchanged $1,602.15, making in all $3,102.15.